## PEOPLE v SAWYER

Docket No. 154251. Submitted March 16, 1995, at Lansing. Decided January 16, 1996, at 9:10 A.M. Leave to appeal denied, 451 Mich —.

Thomas W. Sawyer was convicted by a jury in the Hillsdale Circuit Court, Harvey W. Moes, J., of first-degree criminal sexual conduct, second-degree criminal sexual conduct, kidnapping, and three counts of possession of a firearm during the commission of a felony. The defendant appealed.

The Court of Appeals *held:*

1. Voir dire in this case, which received pretrial publicity, as conducted exclusively by the trial court, did not result in a denial of the defendant's right to a fair and impartial trial. The trial court acted vigorously in the voir dire process to exclude prospective jurors who may not have been capable of rendering fair and impartial decisions. The jurors who were ultimately selected appeared entirely capable of impartial and fair deliberations. The procedure employed by the trial court differed in several significant respects from that in *People v Tyburski,* 445 Mich 606 (1994), which the Supreme Court found unacceptable. The record does not support the defendant's contention that this case was highly publicized and thus required greater measures to guard against juror bias or prejudice that may arise from pretrial publicity.

2. The prosecution did not violate the defendant's Fifth Amendment rights in challenging the defendant's alibi.

3. The trial court did not deny the defendant a fair trial by refusing to order DNA testing of a semen stain on the complainant's underpants. The defendant's exculpatory theory about the stain is highly speculative and does not require a reversal of conviction.

4. The search warrants that were issued were not predicated on known false evidence, nor was material evidence withheld from the issuing magistrate. Probable cause existed even when the challenged evidence is not considered.

5. The prosecution did not adduce false or perjured evidence

REFERENCES

Am Jur 2d, Jury §§ 200, 212.

See ALR Index under Jury and Jury Trial.

in introducing into evidence a blanket found at the defendant's home, and the trial court did not abuse its discretion in admitting this evidence.

6. The defendant's claim that his right to counsel was violated when his lawyers were excluded from a postlineup interview of a witness was not preserved for appellate review. No objection to the interview was raised and the defendant failed to cite authority in support of the contention that the police may not interview a witness after a lineup without the presence of defense counsel.

7. Due process was not denied when the defendant was not able to obtain two separate photographic lineup sheets. Contrary to the defendant's assertion, the complainant did not identify another person as the perpetrator.

8. The trial court did not abuse its discretion in allowing a witness to testify concerning the type of automobile involved in this case. Consistent with the parties' agreement before trial, the evidence was presented without reference to similar acts evidence.

9. Evidence of General Motors' list of nineteen vehicles was properly admitted into evidence. Admission of the evidence was pursuant to stipulation, extracts of voluminous business records are admissible, and the defendant could have examined or made copies of the original records at issue.

10. Fiber evidence to which the defendant objected was tested under accepted laboratory procedure and was properly admitted.

11. The prosecution, in referring to the defendant's attorney-client privilege in the presence of the jury, did not suggest that the jury draw an adverse inference from the defendant's possession of the privilege and therefore did not act improperly.

12. The defendant's claim that his right to a fair trial was violated when a witness inadvertently referred to an investigation concerning a series of abductions was not preserved for appellate review. The defendant failed to object and did not request a curative instruction to the jury.

13. The record does not indicate that there was an aborted first trial. The defendant's claim that intentional conduct by the government prevented submission of the case to the first jury is without merit.

14. The defendant's claim that the length of the trial days resulted in a denial of his right to a fair trial was not preserved for appellate review. The defendant raised no objection.

15. The trial court's instruction regarding reasonable doubt was not erroneous.

16. In view of the fact that no errors were found by the Court

of Appeals, the defendant's claim that the cumulative effect of multiple errors warrants reversal is without merit.

Affirmed.

CRIMINAL LAW — JURY — VOIR DIRE.

A criminal defendant has a right to be tried by a jury whose fairness and impartiality are assured by procedures generally within the discretion of the trial court; specifically, the defendant does not have the right to have counsel conduct voir dire, to sequestered voir dire of individual jurors, to have the trial court ask questions submitted by counsel, or to ask jurors content-based questions concerning the effect of publicity in a highly publicized case.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Michael R. Smith,* Prosecuting Attorney, and *J. Ronald Kaplansky,* Assistant Attorney General, for the people.

*Timothy M. Holloway,* for the defendant.

Before: GRIBBS, P.J., and HOLBROOK, JR., and MARKMAN, JJ.

PER CURIAM. Defendant was convicted by a jury of first-degree criminal sexual conduct, MCL 750.520b(1); MSA 28.788(2)(1), second-degree criminal sexual conduct, MCL 750.520c(1); MSA 28.788(3)(1), kidnapping, MCL 750.349; MSA 28.581, and three counts of possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2). He appeals as of right, raising numerous claims of error. We affirm.

We find that one claim in particular, the validity of the court's voir dire procedures, merits significant discussion. It is undisputed that this case generated a certain amount of pretrial publicity, especially in Hillsdale County where this trial was held. Before trial, defendant moved for a change of venue, which was denied by the trial

court until an attempt to seat a jury was made. When defense counsel broached the subject of the manner in which voir dire would be conducted, the court indicated that it would conduct all voir dire. Defense counsel requested the opportunity to submit written questionnaires to the prospective jurors. The court denied this request, but invited counsel to submit written questions to the court. Defense counsel then requested that prospective jurors who acknowledged exposure to publicity be individually questioned regarding the details of that exposure. This request was turned down by the court. Following voir dire, the court also refused defendant's request for a change of venue.

Defendant argues that his right to a fair and impartial jury was denied by the trial court's inadequate voir dire of the jurors regarding their exposure to pretrial publicity.

A defendant who chooses to be tried by a jury has a right to a fair and impartial trial. *Duncan v Louisiana,* 391 US 145; 88 S Ct 1444; 20 L Ed 2d 491 (1968); *People v Miller,* 411 Mich 321, 326; 307 NW2d 335 (1981). The function of voir dire is to elicit sufficient information from prospective jurors to enable the trial court and counsel to determine who should be disqualified from service on the basis of an inability to render decisions impartially. *People v Brown,* 46 Mich App 592, 594; 208 NW2d 590 (1973). In ensuring that voir dire effectively serves this function, the trial court has considerable discretion in both the scope and conduct of voir dire. *People v Tyburski,* 445 Mich 606, 619; 518 NW2d 441 (1994); MCR 6.412(C). What constitutes acceptable and unacceptable voir dire practice "does not lend itself to hard and fast rules." *Id.* at 623. Rather, trial courts must be allowed "wide discretion in the *manner* they em-

ploy to achieve the goal of an impartial jury." *Id.*
(Emphasis in original.)

In reviewing the trial court's conduct, this Court
must determine whether the trial court conducted
a voir dire "sufficiently probing . . . to uncover
potential juror bias." *Id.* at 609. In our judgment,
the instant voir dire was more than "sufficiently
probing" to achieve its constitutional purpose.

First, the record indicates that the trial court
acted vigorously in the voir dire process to exclude
prospective jurors who may not have been capable
of fairly and impartially hearing the criminal
charges against defendant. Of forty-eight prospec-
tive jurors in this case, eleven were excused for
cause, including eight who were excused by the
court sua sponte when they indicated that, on the
basis of exposure to pretrial publicity or familiar-
ity with one of the witnesses, they would find it
difficult to judge the case impartially. Of the re-
maining thirty-seven prospective jurors, twelve
were excused peremptorily by both sides, who
exhausted their respective challenges. MCR
6.412(E)(1). Defendant's counsel made no effort to
show cause in support of an increased number of
peremptory challenges. MCR 6.412(E)(2).

This involvement by the court in excusing jurors
on its own initiative suggests the material differ-
ences between this case and *Tyburski,* a case in
which the Supreme Court affirmed this Court's
reversal of a conviction because the trial court
relied excessively upon jurors' "self assessment" of
bias. *Id.* at 629-630. Rather, the court's voir dire in
this case manifestly "allowed the elicitation of
enough information from potential jurors to ena-
ble [independent] judgments to be formed by the
court regarding their inability to be impartial."
*Id.; Monaghan v Agricultural Fire Ins Co,* 53 Mich
238, 246; 18 NW 797 (1884). Voir dire was not

"focused on qualifying jurors rather than on discerning bias." *Tyburski, supra* at 627.

Second, the result of the voir dire process in this case was a panel that, in fact, appears entirely capable of impartial and fair deliberations. Defendant's brief identifies by name several jurors who were exposed to pretrial publicity or were inadequately questioned concerning such exposure. Every one of these jurors, however, was peremptorily excused. Of the twelve jurors who were ultimately responsible for deciding this case, only two acknowledged any prior exposure to pretrial publicity. One had read a headline and nothing more concerning the case; the other acknowledged having read about the case but indicated—apparently persuasively to the court—that she did not have any preconceived ideas or notions and that she had not made a decision about any particular facts. Knowledge of publicity concerning a case does not automatically make a prospective juror unfit to serve, if that juror does not have a preconceived notion concerning the defendant's guilt or innocence that cannot be set aside. *Mu'Min v Virginia,* 500 US 415, 430; 111 S Ct 1899; 114 L Ed 2d 493 (1991); *People v Anderson,* 166 Mich App 455, 469; 421 NW2d 200 (1988). In addition to their personal voir dire, these two individuals were also asked as part of collective voir dire whether each had "any reason to believe that you couldn't sit as a completely fair and impartial juror, without any biases or prejudices one way or another in this cause and be able to render a true verdict based only on the evidence as presented and the law as [it is] instructed to you?" and responded that they did not.

Third, the procedure employed by the trial court in this case differed in several significant respects

from that in *Tyburski.* There is no evidence, as in *Tyburski,* that the court here either proscribed any of counsel's questions relating to pretrial publicity or that it declined to ask such questions on the basis of "irrelevance." *Id.* at 626, n 11. Further, when the instant court expressed its intention to conduct its own voir dire, it also expressed that written questions from counsel would be in order. It said, "If you've got some questions you want to ask the jury, you submit them to me and I will go over them with my voir dire. And if they're appropriate, I'll ask them." Shortly thereafter, the court repeated this invitation. No objection was made by defendant's counsel, as in *Tyburski,* concerning the failure of the court to ask any specific questions submitted by counsel. This, doubtlessly, is explained by the fact that counsel appears not to have submitted any questions of his own as in *Tyburski.*

In addition, unlike in *Tyburski,* there is no suggestion that any prospective juror was improperly influenced by the court subtly admonishing earlier-questioned jurors for acknowledging that they had formed a negative opinion about the defendant from pretrial publicity. Several jurors who responded in this manner in *Tyburski* were asked whether they "believe everything that you read in the newspaper" or whether "that is a way to settle disputes by reading the newspaper." *Id.* at 612. The entire jury pool was exposed to, and subsequently questioned jurors arguably were influenced by, these comments, which the court itself belatedly recognized as being inappropriate. *Id.* at 627. In the instant case, however, there is no record that any such inadvertent influencing occurred on the part of the court. Indeed, once a prospective juror admitted significant prior knowledge of the case based upon media exposure, the

court on its own initiative immediately dismissed the juror for cause.

Nor did the instant court ask questions of prospective jurors resembling some of those asked in *Tyburski,* e.g., "Have you developed any opinions that would make you an unfair juror?" Such a question, as the Supreme Court recognized, is "ambiguous and suggests the answer that the court was looking for." *Id.* at 627-628. "Wrong" answers to this question prompted the subtle admonition of the court criticized in *Tyburski* and "sent a strong message that the court did not approve of those who volunteered that they were biased." *Id.* at 628. It was this series of questions, more than anything else, that caused the Supreme Court to assert that the trial court in *Tyburski* had done little more to assess bias than to ask the jurors themselves whether they could be fair and then compounded this problem by discouraging jurors from acknowledging their own inability to be fair.

Fourth, although the defendant seeks to characterize this case as a "highly publicized" one, presumably equivalent in the degree of public attention to that in *Tyburski,* the record does not confirm this characterization. *Tyburski* recognized that there would be "few cases that pose a serious risk of prejudice [to the jury]" and that "few *murder* cases engender the extent of media coverage involved here." *Id.* at 626, n 12 (emphasis supplied). While understanding *Tyburski* to impose an additional measure of caution upon the trial court in all cases potentially infected by pretrial publicity, to whatever degree, we are not persuaded by the record that the instant case more greatly resembles *Tyburski* than it does a normal criminal case in terms of the prophylactic measures that need to be undertaken by the court. Unlike in *Tyburski,* there were no prospective

jurors in the instant case who indicated that knowledge obtained from pretrial publicity caused them to be unable either to accord the defendant a fair hearing or to base their decision upon evidence presented to them in the courtroom. In *Tyburski,* thirty-five of thirty-seven prospective jurors acknowledged exposure to media coverage and eleven of the twelve jurors who decided the case indicated such exposure. *Id.* at 611, n 1. In the instant case, a far lower percentage of prospective and actual jurors acknowledged similar exposure.

There is no right to have counsel conduct voir dire or to individual, sequestered voir dire. *Tyburski, supra* at 619 (opinion of MALLETT, J.), 644 (concurring opinion of BOYLE, J.). Nor is there a right to have the court ask questions submitted by counsel, *id.,* or to content-based questions concerning the effect of publicity in high publicity cases. *Mu'Min, supra* at 431. It is the issue of a juror's ability to judge impartially, rather than the issue of a juror's recollection of particular newspaper articles, that is determinative of whether defendant's right to due process has been upheld. *Mu'Min, supra* at 430. In short, contrary to defendant's assertion, there is no right to any specific procedure for engaging in voir dire. There is simply a right to a jury whose fairness and impartiality are assured by procedures generally within the discretion of the trial court.

*Tyburski* identifies the special nature of the court's responsibilities in conducting voir dire in high publicity cases. It does not alter the fundamental standard for assessing voir dire in these or other cases or impose particular procedures upon the trial court. We do not view the similarities between this case and *Tyburski* as particularly striking ones. Rather, we believe that a review of

all of the circumstances of voir dire in the instant case compel the conclusion that defendant was tried by a fair and impartial jury.

We will now briefly address defendant's other claims of error. There is no merit to defendant's claim that his Fifth Amendment rights were violated when the prosecutor challenged defendant's alibi evidence. Contrary to defendant's claim, *People v Bobo*, 390 Mich 355; 212 NW2d 190 (1973), does not apply in this case. See *People v Collier*, 426 Mich 23, 31; 393 NW2d 346 (1986); *People v Lawton*, 196 Mich App 341, 353; 492 NW2d 810 (1992); *People v Lyles*, 148 Mich App 583, 593; 385 NW2d 676 (1986). The prosecutor's cross-examination was proper.

Defendant also argues that he was denied a fair trial because the trial court refused to order DNA testing of a semen stain on complainant's underpants. The facts of the crime in this case were unlikely to have resulted in a semen deposit on complainant's underwear. Defendant's exculpatory theory about the evidence is highly speculative and reversal is not required on this basis. *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963); *Arizona v Youngblood*, 488 US 51; 109 S Ct 333; 102 L Ed 2d 281 (1988). Moreover, defendant's speculative theory would have required complainant to testify concerning consensual sexual activity with her boyfriend in direct violation of the rape shield statute. MCL 750.520j; MSA 28.788(10); *People v Arenda*, 416 Mich 1; 330 NW2d 814 (1983).

Defendant's next claim of error is that the search warrants that were issued were predicated on known false evidence in violation of his Fourth Amendment rights. Specifically, he argues that the police officers were aware of a semen stain on the victim's underpants. Defendant claims that, if

tested, this evidence might have exculpated him. He contends that the officers failed to inform the magistrate who issued the search warrants of this evidence, which he claims negated probable cause to arrest and hold him in custody. Defendant's argument fails. First, he failed to establish that the semen stain was relevant to material issues in the present case because the crime charged involved fellatio. Second, even if the semen stain had been tested and linked to another person, other evidence available to the police provided ample probable cause to arrest defendant and subject him to a lineup. Because probable cause continued to exist at all times, defendant's arrest was constitutional, his participation in the lineup was not the fruit of an illegal arrest, and the identification was not fruit of the poisonous tree.

There is no merit to defendant's claim that his due process rights were violated by misleading evidence concerning blood factors on a blue blanket taken from defendant's home. The importance of the blanket evidence was not that the stain was made in part by a type O secretor, such as defendant, but that the blanket was linked to defendant by being found in his home. We note also that the testimony challenged by defendant was elicited by defense counsel during cross-examination. We find no evidence that the prosecution knowingly adduced false or perjured evidence and find no abuse of discretion in the admission of the evidence.

Defendant's next claim of error is that his attorney's exclusion from the postlineup interview violated his right to effective assistance of counsel. The trial court appropriately recognized that defendant waived this issue because the two lawyers representing him at the lineup failed to object to the lineup procedures followed. Further, defendant provides no authority to support his contention

that the police may not interview a witness after a lineup without the presence of defense counsel (particularly in the absence of a request from the defense counsel to be in attendance).

Defendant next argues that he was denied due process because he was not able to obtain two separate photographic lineup sheets. Defendant's underlying contention is that complainant identified another person as the perpetrator. There is no merit to this issue. It is clear from complainant's testimony that she never identified the other person as the perpetrator, but that she merely commented that he looked somewhat like the perpetrator but was clearly older. Defendant's speculative claim that some exculpatory use could have been made of the evidence is not a sufficient basis for reversal. *Arizona, supra.*

Defendant's next claim of error is that the affidavits in support of the search warrants contained false information and omitted material evidence that negated probable cause. In *Franks v Delaware,* 438 US 154; 98 S Ct 2674; 57 L Ed 2d 667 (1978), the United States Supreme Court held that the Fourth Amendment requires a hearing where an allegedly false statement used to procure a search warrant is necessary to a finding of probable cause and the defendant makes a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth," was included in a warrant affidavit. Here, even if all of the information challenged by defendant were excluded, there was ample evidence to establish probable cause. Probable cause was established by the following evidence: there was a series of incidents with a common modus operandi, the police sketches looked remarkably like defendant, defendant's car matched most of the relevant characteristics of the vehicle involved

in the incident, a .38 caliber revolver (like that used in the incidents) was registered to defendant and a roll of duct tape (like that used to blindfold the victims) was seen in defendant's wife's car.

Defendant's other challenges to the warrant affidavits also fail. References to the Wixom incident were made before another person was identified as responsible for that similar crime. Officers who followed defendant indicated that he slowed to scout two young boys when no traffic signal required such a slow down. That this conduct occurred near an intersection that may have had stop signs does not make the officers' observations false. A reference to a similar 1974 incident in which defendant was investigated but not charged, because the victim decided not to cooperate with the prosecutors, was appropriate. This evidence was probative even though defendant was not prosecuted and proven guilty beyond a reasonable doubt in that matter. Finally, defendant's arguments about discrepancies with respect to the victims' descriptions of the vehicle fail. It would be remarkable for there to be no discrepancies among so many witnesses. Such discrepancies do not demonstrate falsification. Accordingly, there was no defect that undermined the validity of the search warrants issued.

The trial court did not abuse its discretion in allowing a witness to testify concerning the type of automobile involved in this incident. As the parties agreed before trial, the evidence was presented without reference to similar acts evidence. We find no error.

Defendant's next claim of error is that General Motors' list of nineteen vehicles was improperly admitted into evidence. First, this evidence was admitted by stipulation of the parties, entered in open court, and reduced to a judicial order. This

stipulation was binding on the defense pursuant to MCR 2.507(H). Further, extracts of voluminous business records are admissible under MRE 1006. It was up to defendant to avail himself of his right under MRE 1006 to examine or copy the original records at issue.

Next, the fiber evidence to which defendant objected was tested under an accepted laboratory procedure and was properly admitted. *People v Davis*, 199 Mich App 502, 512-513; 503 NW2d 457 (1993). Defendant's other challenges to the fiber evidence are relevant to the weight rather than to the admissibility of the evidence. We find no abuse of discretion.

Defendant's next claim of error is that the prosecutor improperly referred to defendant's attorney-client privilege in the presence of the jury. This claim fails because the prosecutor was not attempting to suggest that the jury draw an adverse inference from defendant's possession of an attorney-client privilege. See *People v Brocato*, 17 Mich App 277, 303; 169 NW2d 483 (1969). The two instances cited by defendant involved the prosecutor making relevancy objections to questions by defense counsel. Defense counsel did not complain about these instances at trial. Defendant is trying retroactively to place an adverse spin on utterly harmless incidents.

Defendant contends that his right to a fair trial was violated by a witness' inadvertent reference to an investigation of a series of abductions. There was no objection to the reference and no curative instruction was requested. Accordingly, the issue is unpreserved for appellate review. In any event, any error was harmless. *People v Kosters*, 175 Mich App 748, 754; 438 NW2d 651 (1989).

Defendant's next claim of error is that inten-

tional conduct by the government prevented defendant from fairly submitting his case to a first jury. The trial court docket entries and transcripts filed with this appeal indicate that there was no aborted first trial. This issue has no factual relationship to any occurrence in the case at bar.

Defendant argues that he was denied a fair trial because of the length of the trial days. Defendant failed to object to the length of the days below and this issue is not preserved for appeal. *People v Hoffman*, 205 Mich App 1, 14; 518 NW2d 817 (1994). In any case, we find no abuse of discretion in this procedure.

Defendant's next claim of error is that the trial court's "reasonable doubt" instruction was erroneous. The instruction given was indistinguishable from that approved by the United States Supreme Court in *Victor v Nebraska*, 511 US —; 114 S Ct 1239; 127 L Ed 2d 583 (1994), in the companion case of *Sandoval v California.* Accordingly, the instruction was not erroneous.

Defendant's final claim of error is that the cumulative effect of multiple errors warrants reversal in the present case. No cognizable errors have been identified that deprived defendant of a fair trial. Accordingly, reversal under this theory is unwarranted.

Affirmed.