*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
November 5, 2020

Plaintiff-Appellee,

v

No. 348980
Ionia Circuit Court
LC No. 2018-017577-FC

TABITHA ANNE DERYKE,

Defendant-Appellant.

Before: SAWYER, P.J., and M. J. KELLY and SWARTZLE, JJ.

PER CURIAM.

Defendant, Tabitha Deryke, appeals as of right her jury trial convictions of unlawfully driving away of a motor vehicle, MCL 750.413, and larceny in a building, MCL 750.360. Because there are no errors warranting reversal, we affirm.

## I. BASIC FACTS

On September 2, 2018, Nancy Bowne allowed Deryke and Deryke's minor son into her home. Deryke explained to Bowne that her boyfriend had beaten her up and pushed her out of the car, and she asked to use Bowne's telephone to call for aid because her cellular phone battery was dead. Although Bowne did not observe any marks or bruises on Deryke, she decided to help. Inside, Deryke made two phone calls, but no one answered. Bowne offered Deryke coffee and dry clothes, but was unable to find any suitable garments. Deryke then asked to charge her cellular phone. Deryke's son, however, retrieved his own phone and indicated that it was working. Alarmed, Bowne asked Deryke and her son to wait on the patio. Bowne testified that she was going to drive them to the nearest gas station, but had to get ready first. After Bowne went upstairs, Deryke took a set of car keys from Bowne's house and used them to take a vehicle from the driveway.

Once Bowne discovered the vehicle was missing, she called the police. Using an in-vehicle tracking system, a police deputy located the vehicle, which was being driven by Deryke. The deputy turned on her emergency lights and Deryke pulled over. Deryke exited the vehicle and told the deputy that she had dropped off a friend named "Janelle Rapid." Deryke was adamant that she had borrowed the vehicle from Janelle. She also told the deputy that the sweatshirt she was

-1-

wearing, the identification cards she had, and the credit cards in her possession belonged to Janelle. After being told that the vehicle had been reported as stolen, Deryke admitted to the deputy that she had been at Bowne's house. She explained that her boyfriend had forced her, her son, and Janelle from his vehicle, and that, later, Janelle had taken the keys from Bowne's house.

The next day, Deryke gave another statement to the police. She stated that she had been with her boyfriend, her son, and Janelle. They were going to purchase methamphetamine from someone, but on the way her boyfriend became upset because the methamphetamine seller's girlfriend was romantically interested in Deryke. Deryke explained that her boyfriend "whaled" on her and kicked her out of the car. She said that afterward, Janelle took the keys from Bowne's residence and that Janelle was the one who was initially driving the vehicle. Janelle was dropped off later, so Deryke was driving when the police stopped the vehicle.

The police were unable to locate an individual named Janelle Rapid. They did discover, however, that on September 1, 2018 and September 2, 2018, Deryke had used her phone to search for methods of disabling vehicle alarm systems and disabling an in-vehicle tracking system. Moreover, they determined that, contrary to Deryke's claim, the sweatshirt, identification cards, and credit cards in Deryke's possession when she was pulled over belonged to a friend of Bowne's daughter.

At trial, Deryke admitted that she had been the one to take the keys and the vehicle from Bowne's house, but she testified that she had done so under duress. Deryke testified that she had been driving in a vehicle with her son and her ex-boyfriend. She stated that her ex-boyfriend removed knives and other items from his backpack. She was concerned about the danger presented by the knives, so she argued with him. Eventually, she pulled over and he placed the items in the trunk. Her ex-boyfriend took over driving, and they continued arguing. At one point, he threw a pop bottle at the window, which ricocheted and hit her. Eventually, he pulled over and retrieved the items from the trunk and placed them on the road. Deryke testified that she and her son exited the vehicle and started running away, but her ex-boyfriend chased them, caught up, punched her in the back of the head, and continued to hit her. She explained that she had previously seen her boyfriend "do dangerous things with his ex-wives." After she got away, she and her son spent the night fleeing from her ex-boyfriend, who she feared was still looking form them. In the morning, she ended up inside Bowne's house. Deryke testified that she only took the car keys because she saw her ex-boyfriend's vehicle in the area and became scared. Deryke also presented expert testimony from the director of Michigan State University's Safe Place Program. The expert opined that Deryke took the vehicle from Bowne's home because she was under duress.

## II.  SELF-INCRIMINATION

### A.  STANDARD OF REVIEW

Deryke argues that the prosecution violated her Fifth Amendment right against self-incrimination by improperly referring to her decision not to complete a written statement after her

arrest and after she was advised of her *Miranda*[1] rights. This Court reviews de novo constitutional questions. *People v Shafier*, 483 Mich 205, 211; 768 NW2d 305 (2009).

## B. ANALYSIS

Deryke argues and the prosecution concedes that evidence of her post-arrest, post-*Miranda* silence was improperly admitted at trial. Generally, "prosecutorial references to a defendant's post-arrest, post-*Miranda* silence violate[s] a defendant's due process rights under the Fourteenth Amendment of the United States Constitution." *Id*. at 213. However, if a defendant waives her right to remain silent and there is no basis to conclude that her unresponsiveness to questions is attributable to the invocation of that right or reliance on the Miranda warnings, then such evidence of the defendant's silence is not improper and the prosecutor may bring it to the jury's attention. See *People v McReavy*, 436 Mich 197, 203; 462 NW2d 1 (1990).

In this case, Deryke gave a voluntary statement to the police deputy that pulled her over. The next day, after being advised of and waiving her *Miranda* rights, Deryke again made statements to the police regarding the events leading to her driving a vehicle that had been reported as stolen. Deryke does not challenge that those statements were properly admitted at trial. Instead, she contends that the following colloquy between the prosecutor and a police deputy violated her right against self-incrimination:

> *Q*. And did you provide [Deryke] with an opportunity to provide a written statement?
>
> *A*. I did. I asked her if she would be willing to. At the time, she said she would. I brought our blank statement forms into the jail, and I never got the return.

Yet, Deryke did not assert her right to remain silent after the deputy advised her of her *Miranda* rights, nor is there any evidence that, after answering some questions, she later invoked those rights. Thus, on this record, there is nothing indicating that her decision not to return a written statement to the deputy was attributable to the invocation of her right to remain silent or her reliance on the *Miranda* warnings. The deputy's reference, therefore, to Deryke failing to return a written statement after agreeing to provide one is not improper.

Moreover, even if the testimony constituted an improper comment on Deryke's right to remain silent, reversal is not warranted. Besides the above testimony, there was no reference to Deryke's decision to not make a written statement during the prosecutor's opening statement, case-in-chief, cross-examination of any witness, closing argument, or rebuttal argument. The single, isolated reference to the fact that the deputy did not receive a written statement from Deryke after she agreed to provide one was "so minimal that the silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference." *Shafier*, 483 Mich at 214-215 (quotation marks and citation omitted). See also *People v Dennis*, 464 Mich 567, 575,

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

579-580; 628 NW2d 502 (2001). Thus, even if there were an impermissible reference to Deryke's post-arrest, post-*Miranda* silence, reversal is not warranted on the facts before this Court.

## III. EXCULPATORY EVIDENCE

### A. STANDARD OF REVIEW

Deryke next argues that she was denied her due-process right to present a defense of duress because a police video recording that would have shown her demeanor and her potential injuries was destroyed. Generally, a defendant's claim that he or she was denied due process is reviewed de novo. *People v Schumacher*, 276 Mich App 165, 176; 740 NW2d 534 (2007). Because Deryke did not raise the possibility of a due-process violation before the trial court, we review this issue for plain error affecting her substantial rights. See *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).[2]

### B. ANALYSIS

In this case, a police deputy testified that the statements Deryke made in the police vehicle were recorded on an in-car DVD system. The deputy did not have a copy of the recording, however, because it was "not available anymore." He explained that he had discussed preserving the recording with another deputy and that the prosecutor had requested a copy of the video. But when he checked into it, he learned that the video was only retained for 30 days. The deputy believed that the video may have been requested before the 30 days expired, but offered no further explanation. Regardless of any uncertainty as to when the prosecutor requested the video recording, the record reflects that the defense requested a copy of any statements made by Deryke—including statements recorded on video—before the video would have been destroyed.

On appeal, Deryke appears to be arguing that her due-process rights were violated because the prosecution failed to disclose potentially exculpatory evidence in violation of *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963) and that her due-process rights were violated because the prosecution failed to preserve evidentiary material that may have exonerated her. Under *Brady*, the prosecution has an affirmative duty to disclose exculpatory material and impeachment evidence, regardless of whether the defendant requests the evidence. *Brady*, 373 US at 87. To establish a *Brady* violation, the defendant must show that "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) viewed in its totality, is material." *People v Chenault*, 495 Mich 142, 150, 155; 845 NW2d 731 (2014). On the other hand, to warrant reversal on a due-process violation involving the failure to preserve or the destruction of evidence, "a defendant must prove that the missing evidence was exculpatory or that law enforcement personnel acted in bad faith." *People v Hanks*, 276 Mich App 91, 95; 740 NW2d 530 (2007). When the evidence is shown only to be "potentially useful," failure to preserve

---

[2] On appeal Deryke suggests that the issue is preserved because her trial lawyer made a request for discovery and because a police deputy testified that the video was unavailable because it was only retained for 30 days. The record does not reflect, however, that after learning about the video recordings' destruction that her trial lawyer raised a due-process violation before the trial court. Consequently, this issue is not, in fact, preserved for appellate review.

the evidence does not amount to a due process violation unless bad faith can be shown. *Arizona v Youngblood*, 488 US 51, 58; 109 S Ct 333, 337; 102 L Ed 2d 281 (1988). A "[d]efendant bears the burden of showing that the evidence was exculpatory or that the police acted in bad faith." *People v Johnson*, 197 Mich App 362, 365; 494 NW2d 873 (1992).

"Evidence is favorable to the defense when it is either exculpatory or impeaching." *Chenault*, 495 Mich at 155. Deryke argues that the video recording would have shown her demeanor and "potential" injuries after the domestic-violence incident between her and her ex-boyfriend. However, the interviewing deputies testified that Deryke conversed casually and was talking quickly, but that her demeanor otherwise appeared normal during the interview. The deputies did not observe any injuries on defendant. Further, during the interview, Deryke indicated that she had not been assaulted and that she did not have any injuries. A police photograph depicting Deryke on the day of the incident was also admitted into evidence. A deputy testified that Deryke's face appeared sunken in the photograph, but he did not testify regarding any visible injuries on her face. And, in any event, the jury was free to view the photograph and make a determination as to whether she had visible injuries. Given that there is nothing on the record suggesting that the video would have shown that she had a demeanor different than that testified to by the deputies or injuries that would have been visible on the video but not on the photograph, Deryke has failed to show that the evidence would have been favorable to her.

Likewise, she cannot show that the evidence was material. "To establish materiality, a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*. at 150 (quotation marks and citation omitted). Ultimately, "[t]he question is whether, in the absence of the suppressed evidence, the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. at 150-151 (quotation marks and citation omitted). At trial, the prosecution elicited testimony showing that when Deryke made a statement in the police vehicle her demeanor was casual and normal, and the deputies did not observe any injuries on her. A photograph taken the same day also failed to depict any injuries, and Bowne testified that she did not observe any marks or injuries on Deryke when she arrived at Bowne's house. Further, although Deryke testified that her ex-boyfriend punched her in the back of her neck and repeatedly hit her, she did not testify that she was injured by the blows. Nor did she testify that her demeanor was different than what the deputies recounted. Instead, she testified to her fear and her actions in response to that fear. In addition, the defense expert explained to the jury that a victim of domestic abuse, when talking with law-enforcement will sometimes lie and attempt to minimize the abuse. She also explained that not all domestic-violence results in physical injuries. Notably, the expert did not testify to any particular demeanor a victim of domestic abuse would exhibit in the aftermath of being physically assaulted and chased by his or her abuser. Thus, even if a video were introduced into evidence that showed Deryke's demeanor and potential injuries, there is not a reasonable probability that the jury would have reached a different result.

Because Deryke cannot show that the evidence was favorable or material, we discern no *Brady* violation. See *Chenault*, 495 Mich at 155. Further, because Deryke did not meet her burden of showing that the failure to preserve the evidence resulted in the destruction of exculpatory evidence, she is not entitled to relief on that basis either. See *Johnson*, 197 Mich App at 365.

## IV. IMPARTIAL JURY

### A. STANDARD OF REVIEW

Finally, Deryke argues that she was denied her right to a fair trial by impartial jurors and her right to effective assistance of counsel when her trial lawyer failed to challenge two jurors for cause. Because Deryke failed to raise this issue before the trial court, we review this issue for plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763. Further, "[t]he question whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012).

### B. ANALYSIS

"The United States and Michigan Constitutions guarantee a criminal defendant a fair trial by an impartial jury." *People v Jackson*, 292 Mich App 583, 592; 808 NW2d 541 (2011); US Const, Am VI; Const. 1963, art 1, § 20. "The trial court must take appropriate steps to ensure that jurors will not be exposed to information or influences that could affect their ability to render an impartial verdict based on the evidence admitted in court." *Jackson*, 292 Mich App at 592. Voir dire functions to provide the trial court and the lawyers with enough information to determine whether a prospective juror should be disqualified from service on the basis of an inability to render decisions impartially. *People v Sawyer*, 215 Mich App 183, 186; 545 NW2d 6 (1996). Voir dire allows the court and the lawyers to "discover hidden bias that would render a potential juror incompetent." *People v Tyburski*, 445 Mich 606, 619; 518 NW2d 441 (1994). "Jurors are presumptively competent and impartial, and the party alleging the disqualification bears the burden of proving its existence." *People v Johnson*, 245 Mich App 243, 256; 631 NW2d 1 (2001).

In this case, a juror indicated that he was working with law enforcement, including one of the police witnesses, on a work-related investigation. The juror also indicated that he worked with law enforcement officers "quite regularly" during police investigations. The second juror was employed as an emergency medical services provider and had contact with many police officers during the course of his work. Both jurors stated that the fact that they knew of and worked with two of the police witnesses did not impact their ability to act fairly and impartially during jury deliberations. It appears that both jurors' connections to the police officers were limited to the course of their employment. On appeal, Deryke proclaims that the jurors were biased, but offers nothing to dispute their statements that the contact was work-related and would not impact their ability to act fairly and impartially if selected for the jury. Therefore, defendant did not overcome the presumption that jurors are competent and impartial or show that there was a plain error that affected her substantial rights. See *Carines*, 460 Mich at 763-764; *Johnson*, 245 Mich App at 256.

Deryke has also not overcome the presumption that her defense lawyer provided her with effective assistance during voir dire. See *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004) ("Effective assistance of counsel is presumed, and the defendant bears the heavy burden of proving otherwise."). Here, the trial court inquired of the prospective jurors during voir dire whether they had contact with law enforcement and whether that contact may have influenced their opinion of law enforcement officers. The trial court also questioned the challenged jurors about whether their contact with the police witnesses would affect their ability to be fair and

impartial jurors in this case. Again, both jurors indicated that their contact with the police officers would not impact their ability to be fair and impartial and that they could keep an open mind and apply the law to the facts of the case as the trial court instructed. Although Deryke's lawyer did not ask any independent questions regarding the jurors' contact with the law enforcement officers, the trial court's questions had already addressed the relevant inquiries. Deryke's lawyer was not ineffective for failing to re-ask the jurors questions that they had just finished answering. Based on the prospective jurors' answers to the trial court's questions, Deryke's lawyer decided not to challenge them for cause. Considering that a defense lawyer's decisions regarding the selection of jurors is generally a matter of trial strategy, see *Johnson*, 245 Mich App at 259, we discern no reversible error.

Affirmed.

/s/ David H. Sawyer
/s/ Michael J. Kelly
/s/ Brock A. Swartzle