*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

DAMIEN LEE LANG,

       Defendant-Appellant.

UNPUBLISHED
April 08, 2025
9:52 AM

No. 369188
Kalamazoo Circuit Court
LC No. 2022-002079-FC

Before: GADOLA, C.J., and WALLACE and ACKERMAN, JJ.

PER CURIAM.

Defendant appeals as of right his jury convictions for second-degree murder, MCL 750.317, carrying a concealed weapon (CCW), MCL 750.227, possession of a firearm by a person convicted of a felony (felon-in-possession), MCL 750.224f, and two counts of third-degree carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b. He was sentenced as a fourth-offense habitual offender, MCL 769.12, to 70 to 100 years' imprisonment for the murder conviction, 10 to 30 years' imprisonment for the CCW conviction, 10 to 30 years' imprisonment for the felon-in-possession conviction, and 10 years' imprisonment for each felony-firearm conviction. We affirm.

## I. BACKGROUND

This case arises out of the shooting death of Bryce Salter in the parking lot of the Y Bar in Kalamazoo, Michigan, during the early morning hours of November 11, 2022.

The evidence presented at trial established that Salter and his friend, Anthony Villegas, were at the Y Bar that evening. Defendant, who did not know Salter or Villegas, was also present. At approximately 3:00 a.m., Salter and defendant got into a physical altercation in the parking lot. During the altercation, defendant shot Salter in the back, killing him. Surveillance footage depicting the altercation and shooting was admitted into evidence and played for the jury.

Villegas testified that while he was standing outside the bar, he noticed a commotion in the middle of the parking lot. As he ran toward it, he heard gunshots. He then saw Salter clutching

-1-

his chest and stating that he had been shot. However, Villegas did not see the shooting and could not identify defendant as the shooter. He denied that either he or Salter had a gun that evening.

Defendant asserted a theory of self-defense at trial. He testified that the altercation began when he saw Salter reach into defendant's Dodge Durango, which was parked in the lot. When defendant confronted Salter, Salter threatened to assault him. In response, defendant "lightly shoved" Salter. After Salter continued to make threats, defendant shoved him again, causing him to fall to the ground. Salter then stood up and charged at defendant, initiating a physical altercation. Defendant claimed that during the struggle, Salter repeatedly attempted to reach for a gun tucked into the waistband of defendant's pants.

Defendant further testified that Villegas approached and punched him, prompting defendant to punch Villegas. According to defendant, Villegas removed his jacket and pulled out a gun.[1] As defendant attempted to retreat, he heard someone say, "Blow that bitch," which he understood to be a directive to shoot. He heard a pop, drew his own gun, and fired one or two gunshots in the direction "of the people that [were] running towards [him]." Defendant then got into his vehicle and left the scene.

Kalamazoo Department of Public Safety Detective Stephen Seiser testified that he identified defendant from the surveillance footage and subsequently arrested and interviewed him. During the interview, defendant admitted that he shot Salter but did not claim that he acted in self-defense. Instead, he claimed that he blacked out and did not remember what happened. He was unable to confirm whether anyone else at the bar had a gun.

Detective Seiser later recovered the gun defendant used from the residence where defendant was apprehended. Another officer testified that three fired cartridge casings were collected from the scene, and a firearms and toolmark examiner testified that all three had been fired from defendant's gun.

After the presentation of evidence, defendant was convicted and sentenced as described above. He now appeals.

## II. DISCUSSION

### A. PROSECUTORIAL MISCONDUCT

Defendant first submits that he was denied his right to a fair trial due to prosecutorial misconduct. Specifically, he claims that the prosecution improperly injected the issue of gun violence in Kalamazoo during voir dire, its examination of Detective Seiser, and closing argument.

---

[1] Although the surveillance footage is somewhat difficult to discern because of its angle and quality, it does not appear to show Villegas punching defendant or brandishing a gun. In his testimony, defendant acknowledged that the surveillance footage does not reveal whether Villegas had a gun.

-2-

## 1. PRESERVATION AND STANDARD OF REVIEW

To preserve a claim of prosecutorial misconduct, a defendant must contemporaneously object to the purported misconduct and request a curative instruction. *People v Isrow*, 339 Mich App 522, 529; 984 NW2d 528 (2021). Defendant did not object on the record to the alleged misconduct, and the prosecution contends that the issue is unpreserved.

However, the record shows that defendant did, in fact, raise the issue with the trial court and request a curative instruction. After the prosecutor asked a prospective juror whether he was "willing to sit and listen to determine if [defendant] is in part responsible for the violence in Kalamazoo," defendant requested a sidebar. Immediately after, the trial court instructed the prospective jurors that it was their responsibility to decide the case based solely on the evidence and the law. The court also elicited a promise from the jurors to adhere to these principles.

Although an unrecorded sidebar discussion does not necessarily preserve an objection, "[t]he purpose of the appellate preservation requirements is to induce litigants to do what they can in the trial court to prevent error and eliminate its prejudice, or to create a record of the error and its prejudice." *People v Mayfield*, 221 Mich App 656, 660; 562 NW2d 272 (1997). Defendant's immediate request for a sidebar, followed by the trial court's instruction, supports that the issue was raised and addressed. See *People v Cross*, 202 Mich App 138, 143; 508 NW2d 144 (1993). Accordingly, this issue is preserved.

We review preserved claims of prosecutorial misconduct de novo to determine whether the alleged misconduct deprived the defendant of a fair trial. See *People v Dunigan*, 299 Mich App 579, 588; 831 NW2d 243 (2013); see also *People v Bahoda*, 448 Mich 261, 266-267; 531 NW2d 659 (1995).

## 2. GENERAL PRINCIPLES GOVERNING PROSECUTORIAL MISCONDUCT

"Issues of prosecutorial misconduct are reviewed on a case-by-case basis by examining the record and evaluating the remarks in context." *People v Mann*, 288 Mich App 114, 119; 792 NW2d 53 (2010) (cleaned up). "Prosecutorial comments must be read as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial." *People v Brown*, 279 Mich App 116, 135; 755 NW2d 664 (2008).

A prosecutor may not urge jurors to convict as part of their "civic duty." *Bahoda*, 448 Mich at 282. That type of argument is improper because it introduces extraneous concerns and encourages jurors to set aside impartial judgment. *People v Abraham*, 256 Mich App 265, 273; 662 NW2d 836 (2003). Similarly, a prosecutor may not appeal to the jury's fears and prejudices, *Bahoda*, 448 Mich at 282, or improperly invoke sympathy for the victim, *People v Watson*, 245 Mich App 572, 591; 629 NW2d 411 (2001). However, "[c]urative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements, and jurors are presumed to follow their instructions." *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008) (citations omitted).

## 3. QUESTIONS DURING VOIR DIRE

Defendant asserts that the prosecution improperly introduced the issue of gun violence by asking jurors about it, thereby injecting bias into the trial.

"The function of voir dire is to elicit sufficient information from prospective jurors to enable the trial court and counsel to determine who should be disqualified from service on the basis of an inability to render decisions impartially." *People v Sawyer*, 215 Mich App 183, 186; 545 NW2d 6 (1996). Trial courts have broad discretion in conducting voir dire to ensure that it serves that function. *Id*.; see also MCR 6.412(C).

Here, the prosecutor asked prospective jurors several questions about gun violence in Kalamazoo, including whether it was a problem, how they felt about it, who was responsible, whether gun ownership implied responsibility, whether certain people should be able to own guns, and who was responsible for solving gun violence.

Some statements connected defendant to gun violence in Kalamazoo. For example, in response to prospective jurors' comments that gun violence was a "big issue" and that the solution "requires a lot of thought," the prosecutor explained that defendant was accused of gun violence in Kalamazoo. He then asked whether the prospective jurors would be predisposed to forming an opinion about defendant's guilt and whether they could withhold judgment until hearing all of the evidence. Additionally, after a prospective juror said that the community was responsible for addressing gun violence, the prosecutor asked whether the juror would be comfortable "listening and coming to a decision" about whether defendant was partially responsible for community gun violence. The juror responded affirmatively.

The prosecutor also noted that his questions appeared to make one juror uncomfortable. In response, the prospective juror stated that he was "a firm believer in the Second Amendment" and expressed his perspective that "it's not the honest citizen that commits gun violence. It's those that typically . . . have them illegally, so that's usually where the crime is." The prosecutor then explained that one of the charges against defendant was felon-in-possession and asked whether that information would predispose the juror to bias against defendant. The juror responded that "the proof would have to be present in his mind" and that he "probably would have a hard time if that [charge] was proven early" but he still had to sit through several more days of trial.

The trial court later followed up on this exchange, eliciting a promise from this juror to "listen to the evidence, and not make a decision about anything until you're charged with the responsibility of deliberating and deciding." The court also questioned another prospective juror regarding his close relationships with people who had been victims of gun violence and whether he could remain unbiased regarding someone accused of a gun-related killing. The trial court excused that juror due to his potential bias.

Taken in full context, the prosecutor's questions regarding gun violence and defendant's role in it were asked to *elicit* the jurors' biases, not to *invoke* the jurors' biases. See *id*. at 187. That conclusion is reinforced by the fact that the prosecutor's questions and the trial court's follow-up questions resulted in the excusal of a juror who expressed bias against someone accused of gun violence. Moreover, even if the prosecutor's voir dire questions and comments invoked some bias

against defendant, reversal would not be warranted. Any potential prejudice was mitigated by the trial court's instructions, which emphasized that the jury's "sole responsibility" was to base its verdict on the evidence and the law. See *Unger*, 278 Mich App at 235. Defendant has not established that the prosecution's voir dire questions deprived him of a fair trial.

## 4. EXAMINATION OF DETECTIVE SEISER

Defendant also contends that the prosecution engaged in misconduct by eliciting testimony from Detective Seiser about gun violence in Kalamazoo.

Defendant's claim of prosecutorial misconduct with respect to Detective Seiser's testimony arises from the following exchange during his direct examination:

> *The Prosecutor*: Were you called in the early morning hours to—to begin investigating a homicide from November 11th, 2022[,] at the Campus Pointe Mall?
>
> *Detective Seiser*: Yes, I was. I was at home and I received a call from one of my command officers advising that an individual had been shot, and that—that assistance was needed in order to investigate the incident.
>
> *The Prosecutor*: At that point are you named the lead investigator, or how does that come about?
>
> *Detective Seiser*: Sure. It's a valid question. So, the Major Crime Unit actually has four of us—four detectives that are assigned to it, and we work on a rotating basis. And, it usually works where each detective works on a rotation. This year due to the amount of gun violence in the City of Kalamazoo we've had to have other detectives work on homicides, because there's just been so much work that we have not been able to handle it with just the four of us.
>
> *The Prosecutor*: Who are the four detectives currently assigned to the Major homicides or crimes?

Detective Seiser responded with the names of the other detectives assigned to that unit and went on to explain each detective's specific expertise.

Contrary to defendant's assertion, the prosecutor did not engage in misconduct by asking Detective Seiser when and how he became the lead investigator in the case. "A finding of prosecutorial misconduct may not be based on a prosecutor's good-faith effort to admit evidence." *People v Dobek*, 274 Mich App 58, 76; 732 NW2d 546 (2007). The prosecutor's questions focused on the investigative team assigned to the case and how Detective Seiser became assigned lead investigator. Detective Seiser's testimony was admissible, and the defendant has not established that the prosecutor's questioning was anything other than a good-faith effort to introduce relevant evidence. Further, after Detective Seiser mentioned the volume of gun violence in Kalamazoo, the prosecutor promptly redirected questioning to the four detectives working on the case. Accordingly, the prosecutor's examination of Detective Seiser did not constitute prosecutorial misconduct, and defendant is not entitled to relief on this claim.

## 5. CLOSING ARGUMENT

Finally, defendant submits that the prosecution engaged in misconduct during its closing argument by inflaming the passions of the jury when the prosecutor argued: "[Defendant] armed himself in East—in Lansing. He armed himself. He intentionally armed himself in Lansing. Came back to Kalamazoo or came to Kalamazoo. Said he'd never been here before, and killed one of our people. He then fled Kalamazoo going back to Lansing."

"Generally, prosecutors are accorded great latitude regarding their arguments and conduct. They are free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *Bahoda*, 448 Mich at 282 (cleaned up). In this case, each of the prosecutor's statements was supported by evidence admitted at trial. During his interview with Detective Seiser, defendant said that he did not know anyone in Kalamazoo. At trial, he confirmed that he armed himself before traveling to Kalamazoo on the day of the shooting. He also admitted to killing Salter, a Kalamazoo resident, before fleeing back to Lansing.

The prosecutor's remarks also must be reviewed in context, see *Mann*, 288 Mich App at 119, and evaluated in light of the defense's arguments, see *Brown*, 279 Mich App at 135. The broader context for the prosecutor's quote is as follows:

> Shot in the back. What person, any person, is in danger when you shoot them in the back?
>
> [Defendant] intentionally killed Bryce Salter. [Defendant] armed himself in East—in Lansing. He armed himself. He intentionally armed himself in Lansing. Came back to Kalamazoo or came to Kalamazoo. Said he'd never been here before, and killed one of our people. He then fled Kalamazoo going back to Lansing.
>
> He spent 2 $^1/_2$-hours telling the police officer he doesn't know why he did it, he just did. Well, we saw why he did it. Bryce Salter did not back down. For that, he had an execution. I trust that after you give this the time and effort it deserves, you will find [defendant] guilty of everything.

This context establishes that the prosecutor was addressing the evidence regarding defendant's intent to kill Salter and countering defendant's claim of self defense. The prosecutor did not explicitly urge the jury to convict as a civic duty.

Moreover, even if the prosecutions statements prejudiced defendant, any potential prejudice was cured when the trial court instructed the jury to base its verdict "only on the evidence and [the trial court's] instructions on the law." The court specifically instructed jurors not to "let sympathy or prejudice influence [their] decision" and emphasized that "[t]he lawyers' statements and arguments are not evidence" and that "[t]he lawyers' questions to the witnesses also are not evidence." Those instructions mitigated any improper influence from the prosecutor's remarks. See *People v Stimage*, 202 Mich App 28, 30; 507 NW2d 778 (1993) (holding that a prosecutor's improper civic duty argument during his closing statement "was cured by a cautionary instruction that arguments of counsel are not evidence." (cleaned up)). Given these instructions and the

overall context of the prosecutor's remarks, defendant has not established that he was denied a fair trial.

## B. DETECTIVE SEISER'S TESTIMONY

Defendant next raises several claims of error regarding Detective Seiser's testimony on the surveillance footage of the homicide. Specifically, defendant contends that Detective Seiser provided improper expert opinion testimony, gave impermissible character and profile testimony, and invaded the province of the jury while narrating the footage. We disagree.

### 1. PRESERVATION AND STANDARD OF REVIEW

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). Here, defense counsel objected to portions of Detective Seiser's testimony on grounds unrelated to those now raised on appeal. Accordingly, those claims of error are unpreserved. See *id*.

We review unpreserved claims of evidentiary error for plain error affecting a defendant's substantial rights. *People v Brown*, 326 Mich App 185, 195; 926 NW2d 879 (2018), amended 326 Mich App 185 (2019). To obtain relief under the plain-error rule, a defendant must show that "(1) an error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the plain error affected substantial rights, i.e., prejudiced defendant by affecting the outcome of the proceedings." *People v Anderson*, 341 Mich App 272, 279; 989 NW2d 832 (2022) (quotation marks and citation omitted). Even if those requirements are met, reversal is warranted only if the error "resulted in the conviction of an actually innocent defendant" or "seriously affected the fairness, integrity, or public reputation of judicial proceedings independent of the defendant's innocence." *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999) (cleaned up).

### 2. OPINION TESTIMONY AND INVADING THE PROVINCE OF THE JURY

Defendant contends that Detective Seiser provided improper expert opinion testimony when he narrated the surveillance footage to the jury, thereby invading the province of the jury.

MRE 702 governs expert opinion testimony. At the time of defendant's trial, it provided:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product

of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[2]

By contrast, MRE 701 governs lay opinion testimony and provided at the time of defendant's trial:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Lay opinion testimony admissible under MRE 701 is nonetheless subject to exclusion if it invades the province of the jury. *People v Fomby*, 300 Mich App 46, 53; 831 NW2d 887 (2013). A witness invades the province of the jury by interpreting a video in a way that the jury is equally capable of interpreting. *Id*. at 52-53. Likewise, a witness invades the province of the jury by expressing an opinion on the defendant's guilt or innocence. *Id*. at 53. However, testimony is not objectionable solely because it "embraces an ultimate issue." MRE 704.

During trial, the prosecution played the surveillance footage while Detective Seiser described what it depicted. The detective was asked whether he could see anything in defendant's hands at a particular moment and testified:

> [B]ased on my 7 ½-years as an investigator with the Kalamazoo Valley Enforcement Team where I conducted hundreds of hours of surveillance of watching people, watching their mannerisms, watching violent felon—felons in the way that they operate. It appeared to me that based on [defendant's] movement here, that he was removing a firearm from his—from a pocket.

He further stated that defendant appeared to be holding something in his hand that was "consistent with the way that someone would hold a gun" and that defendant made a "furtive movement" that "was very distinguishable" based on the detective's training and experience. Defendant contends that this constituted expert opinion testimony, even though Detective Seiser was not qualified as an expert.

Detective Seiser's testimony was proper lay testimony under MRE 701. The surveillance footage at issue was short but chaotic—especially on a first viewing—and showed numerous individuals and vehicles moving throughout the parking lot. The detective explained that he watched the footage more than 30 times and reviewed it frame-by-frame. His statements were based on his perceptions of the video and experience investigating violent crimes. See MRE 701; *Fomby*, 300 Mich App at 50; *People v Oliver*, 170 Mich App 38, 50-51; 427 NW2d 898 (1988).[3]

---

[2] Our Supreme Court adopted substantial amendments to the Michigan Rules of Evidence effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). Citations and references to the rules of evidence in this opinion refer to the versions in effect at the time of defendant's trial.

[3] "Although cases decided before November 1, 1990, are not binding precedent, MCR 7.215(J)(1), they nevertheless can be considered persuasive authority." *People v Craig*, 342 Mich App 217, 226 n 3; 994 NW2d 792 (2022) (quotation marks and citation omitted).

Detective Seiser's testimony did not require scientific, technical, or specialized knowledge; rather, it reflected his observations from watching the footage repeatedly and his experience investigating violent crimes. The challenged testimony thus did not involve such "highly specialized knowledge" as to render it impermissible when offered by a lay witness. *People v McLaughlin*, 258 Mich App 635, 658; 672 NW2d 860 (2003).

Additionally, the testimony was helpful to the determination of a fact in issue. See MRE 701. The video's angle, glare from headlights, and shadows make it difficult to discern details in the footage. Detective Seiser's testimony highlighted movements that could have been easy to overlook, which were relevant to determining defendant's intent, premeditation, and perception of danger. Considering that the testimony at issue could aid the jury in discerning the events depicted in the video, see *Fomby*, 300 Mich App at 52, and was based upon the detective's own perceptions and experience, the testimony was permissible lay testimony under MRE 701.

Detective Seiser's lay testimony also did not invade the province of the jury. Defendant submits that Detective Seiser improperly opined that defendant was not having "a friendly communication" with Salter before the shooting and that defendant was the aggressor. However, that argument is unpersuasive. While the testimony touched on defendant's theory of self-defense, it did not amount to an opinion on defendant's guilt or innocence. Instead, Detective Seiser testified about his observations of the video, which did not invade the province of the jury. See MRE 704; *Fomby*, 300 Mich App at 53. Moreover, Detective Seiser's extensive review of the video placed him in a better position than the jury to notice certain details. See MRE 704; *Fomby*, 300 Mich App at 53. Although the jurors could interpret the footage themselves, Detective Seiser's testimony still was helpful because he had studied the video extensively before appearing at trial. See *Fomby*, 300 Mich App at 52.

Because Detective Seiser's testimony was admissible under MRE 701 and did not improperly invade the province of the jury, defendant has not established that the trial court plainly erred by admitting it.

### 3. CHARACTER AND PROFILE TESTIMONY

Defendant contends that Detective Seiser provided improper character evidence and inadmissible profile evidence when he testified that the surveillance footage appeared to show defendant removing a firearm from his pocket.

MRE 404(a)(1) provides that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." In the context of drug cases, profile evidence has been described as an "informal compilation of characteristics" that are commonly associated with the profiled group. *People v Hubbard*, 209 Mich App 234, 239; 530 NW2d 130 (1995) (citation omitted). While expert testimony about profile evidence may sometimes assist the jury by providing background or modus operandi insights, profile "evidence is inherently prejudicial . . . because the profile may suggest that innocuous events indicate criminal activity." *People v Murray*, 234 Mich App 46, 53, 56; 593 NW2d 690 (1999) (quotation marks and citation omitted). Accordingly, "[a]ttorneys and courts must clearly maintain the distinction between the profile and the substantive evidence" of a

defendant's guilt. *Id*. at 57. Whether profile evidence is admissible depends on the specific facts of the case. *Id*. at 54-55.

Here, Detective Seiser's suggestion that defendant moved his hand in a manner similar to other people whom Detective Seiser had previously observed or surveilled, including violent felons, was not profile evidence. As an initial matter, it is unclear which group Detective Seiser was purportedly profiling. To the extent that he was explaining the characteristics of violent felons, his opinion about a hand movement near a pocket did not create the "compilation of characteristics" typically associated with profile evidence. *Hubbard*, 209 Mich App at 239 (citation omitted).

Moreover, even if Detective Seiser's testimony about defendant's hand movement were profile evidence, it would still be admissible. Detective Seiser did not testify as an expert on profile evidence, and the prosecution did not use his testimony as substantive evidence of defendant's guilt. See *Murray*, 234 Mich App at 56-58. As discussed, Detective Seiser testified as a lay person, providing an opinion based on his direct observations of the surveillance video, which he had watched more than 30 times. Additionally, the prosecutor never argued that defendant drew his gun while approaching Salter near the Durango, as Detective Seiser opined. The detective's testimony was not profile evidence, but even if it was, it would have been admissible.

Detective Seiser's testimony also does not constitute improper character evidence under MRE 404(a)(1). Defendant did not object on this basis at trial, so the prosecution did not provide an offer of proof regarding the testimony. Regardless, the prosecution did not use Detective Seiser's testimony to prove that defendant acted in conformance with the traits of violent felons or any of the other people who Detective Seiser previously surveilled. See MRE 404(a)(1).

Even if Detective Seiser's testimony could be interpreted as identifying a character trait of violent felons and suggesting that defendant acted in conformance with that character trait, its admission was not plain, outcome-determinative error. See *Carines*, 460 Mich at 763. It is improbable that Detective Seiser's opinion about when defendant pulled out his gun affected the outcome of this trial because defendant did not contest that he shot and killed Salter; rather, defendant asserted that he acted in self-defense. Indeed, defendant admitted in his own testimony that he removed a gun from his waistband and fired multiple shots in Salter's direction. We thus cannot conclude that Detective Seiser's testimony that defendant appeared to remove a gun from his pocket in the surveillance footage "affect[ed] the outcome of the proceedings." *Anderson*, 341 Mich App at 279. Defendant therefore has not established that the trial court plainly erred by admitting that testimony.

Affirmed.

/s/ Michael F. Gadola
/s/ Randy J. Wallace
/s/ Matthew S. Ackerman

-10-