*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

UNPUBLISHED
July 1, 2021

v

No. 348250
Kent Circuit Court
LC No. 18-001493-FC

CAMERON DAVON WRIGHT,

        Defendant-Appellant.

Before: MURRAY, C.J., and FORT HOOD and GLEICHER, JJ.

PER CURIAM.

A jury convicted Cameron David Wright of first-degree murder, MCL 750.316; possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b; felon in possession of a firearm (felon-in-possession), MCL 750.224f; and carrying a concealed weapon (CCW), MCL 750.227, for the 2013 murder of Andre Davis in a drive-by shooting. Wright raises a slew of challenges on appeal, none of which warrant relief. We affirm.

## I. BACKGROUND

Andre Davis was killed in 2013 during a drive-by shooting. None of the four surviving occupants of the vehicle in which Davis was riding could identify the shooter. They agreed, however, that the shots came from a silver or gray Chrysler 300.

Testimony at trial revealed that Davis was a bystander casualty of a fist fight between Wright and Eric Braswell, another occupant of Davis's vehicle. Braswell and Wright fought at a party at the Latvian Hall in Grand Rapids. Everyone fled after an unidentified person fired a gun. Shortly thereafter, the prosecutor alleged, Wright tracked down the vehicle in which Braswell was riding and fired several shots out the window. Davis was the only one struck and killed.

Police interviewed several people during the initial investigation, including Wright. Wright admitted to getting into a fight at the party and another partygoer indicated that Wright was carrying a handgun that evening. However, Wright told police he went straight home when he fled the hall and the police could not link Wright to the shooting at that time.

-1-

Police reopened the investigation in 2017 and issued investigative subpoenas to several witnesses in January 2018. Significant evidence demonstrated that Wright attempted to stymie the renewed investigation, which was closing in on him as the primary suspect. After his arrest, Wright called his ex-girlfriend, Kiara Adams, from jail and asked her to "[g]et a bag out of the woods" in the back of her house and give it to his mother.[1] Although she complied with this request, Adams claimed that she "never looked in the bag" and did not know its contents. The prosecution theorized that this bag contained the murder weapon. As the investigation continued, Wright instructed Adams to lie in the event questions were asked.

Jovan Turley had been at the hall with Wright. He testified that Wright was carrying a gun that night but dropped or lost it at the hall. After fleeing, Turley drove defendant to a house, and Wright went inside for about 25 minutes. On the way, Wright made a phone call in which he discussed a gun. When Turley left, Wright got into a silver car with Eduardo Welford, Curtis Swift, and Tyrice Morris.

Welford testified that he was driving his silver Chrysler 300 on the night in question and eventually picked up Wright. Wright asked Welford to lie to police when he received an investigative subpoena. However, Welford told police that Wright fired several shots at the vehicle in which Davis was riding. Morris corroborated that Wright was the shooter. Another friend of Wright's, Willie Calvin, testified that Wright "went silent and hung up" when he asked Wright about the shooting.

The other passenger in the Chrysler 300—Curtis Swift—was murdered during the investigation. Wright was tried and convicted for that murder as well. Wright appeals those convictions in Docket No. 348251, which is being decided contemporaneously with this appeal. Police conducting a welfare check found Swift dead alone in his home on January 19, 2018. Swift had been shot in the head, but no valuables were taken from his home or his person.

Bao Nguyen had been at Swift's home on January 17. Nguyen described Swift as nervous and paranoid that evening. When Nguyen left Swift's home, he saw Wright approach the house. Nguyen tried to call Swift shortly after he left, but Swift did not answer. Two of Swift's ex-girlfriends also testified that Swift had been nervous and planned to leave town because he was afraid to testify against Wright. And although Wright's phone records showed that he sent several texts to Swift before his death, Wright had manually deleted those messages from his phone. The prosecution argued that Wright killed Swift to prevent him from testifying and to frame him as Davis's shooter.

Wright chose not to testify and did not present any evidence at trial. In her closing argument, the prosecutor stressed Wright's motive, his procurement of a gun after the Latvian Hall shooting, his presence in the vehicle from which the shots were fired, his false statements to the

---

[1] Because Adams was unavailable, the prosecution read her preliminary examination testimony into the record. A police detective was able to corroborate the time and contents of Wright's jailhouse call.

police, and his efforts to destroy evidence and influence witnesses. The prosecution also emphasized the evidence tending to prove that Wright killed Swift because he was an eyewitness.

Defense counsel argued that the witnesses' descriptions of the shooting were physically impossible. Specifically, the witnesses testified that the vehicles were "Even Steven" when the shooting occurred. As Wright sat in the backseat and Davis in the front, the bullet trajectories did not support that Wright was the shooter. Defense counsel further questioned the veracity of the eyewitnesses.

The jury found Wright guilty on all counts. Wright now appeals.

## II. MISSING WITNESS INSTRUCTION

Wright contends that the trial court should have read a missing-witness instruction to the jury because the prosecution did not show due diligence in securing Adams' attendance at trial. Absent due diligence, Wright continues, the admission of Adams' preliminary examination testimony violated his constitutional right to confront the witnesses against him.

Wright's complaints are in vain as defense counsel waived this challenge, extinguishing any error. At trial, defense counsel indicated that he and the prosecutor had already discussed the issue and had agreed that the prosecutor would lay a foundation for the efforts she made to locate the witness. If those efforts satisfied the court, the defense would allow the preliminary examination testimony to be read into the record. The prosecutor outlined the efforts made to locate Adams and the court determined that the prosecutor had exercised due diligence.

"When defense counsel clearly expresses satisfaction with a trial court's decision, counsel's action will be deemed to constitute a waiver." *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011). Waiver extinguishes any error and precludes a party from challenging the issue on appeal. *Id*. Wright cannot raise this challenge on appeal and is not entitled to relief.

## III. JURY SELECTION

Wright next contends that biased jurors were impaneled to hear his case and he challenges defense counsel's performance during jury selection. He contends that counsel failed to adequately question and seek removal of jurors who would harbor bias against him.

Wright focuses his attention on three jurors. Juror LV indicated during voir dire that she has one nephew in law enforcement and another with a criminal past. When asked if she would favor one side over the other, LV responded, "I don't believe so." She responded, "I would think so," when asked if she could be fair to both sides and could follow the court's instructions. She agreed that she was prepared to do her civic duty. Juror KK answered in the affirmative with the group when asked if she would presume defendant innocent until proven guilty beyond a reasonable doubt. When asked individually if she could follow the law as given by the court, KK stated, "I hope so. I honestly don't know." After being given a hypothetical, KK asserted "I believe I could" apply the law as instructed. Finally, juror JJ replied that he had "[n]ever experienced it before" and "I think it would be very difficult, but following the instructions on the law, I think I could," when asked if he could find someone guilty beyond a reasonable doubt based

only on witness testimony. However, JJ repeatedly stated that he could be fair, base his opinion on the evidence, and was "capable" of hearing this murder case.

As Wright failed to raise contemporaneous objections to the impaneling of the subject jurors, our review is limited to plain error affecting Wright's substantial rights. *People v Jackson*, 292 Mich App 583, 592; 808 NW2d 541 (2011). Defendant filed a motion in this Court to remand for a hearing pursuant to *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973), to further develop his ineffective assistance of counsel claim. This Court denied that motion. *People v Wright*, unpublished order of the Court of Appeals, entered October 6, 2020 (Docket No. 348250). A *Ginther* hearing remains unnecessary as the challenges to counsel's performance can be adequately reviewed on the existing record.

To obtain relief under an ineffective assistance theory, a defendant must demonstrate that his counsel's performance fell below an objective standard of reasonableness and that but for counsel's deficient performance, there is a reasonable probability that a different outcome would have obtained. *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984). To establish that counsel's performance was deficient, a defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004). To establish prejudice, the defendant must demonstrate a reasonable probability that, but for counsel's errors, the result of the proceedings would have differed. *Id*. at 663-664. "Effective assistance of counsel is presumed, and a defendant bears a heavy burden to prove otherwise." *People v Traver*, 328 Mich App 418, 422; 937 NW2d 398 (2019) (cleaned up).

Criminal defendants have the right to be tried by a fair and impartial jury. See *People v Budzyn*, 456 Mich 77, 88; 566 NW2d 229 (1997). "Jurors are presumptively competent and impartial, and the party alleging the disqualification bears the burden of proving its existence." *People v Johnson*, 245 Mich App 243, 256; 631 NW2d 1 (2001). This is an uphill battle for an appellant, both in proving that he was denied a trial before a fair and impartial jury and in establishing that his counsel should have challenged a juror. Indeed, the choices involved in impaneling a jury are usually considered trial strategy. *Id*. at 259.

"[W]here the trial court, rather than the attorneys, conducts voir dire," the court must "adequately question jurors regarding potential bias so that challenges for cause, or even peremptory challenges, can be intelligently exercised." *People v Tyburski*, 445 Mich 606, 619; 518 NW2d 441 (1994). For an attorney selecting his client's jury, "[p]erhaps the most important criteria . . . include a potential juror's facial expressions, body language, and manner of answering questions." *People v Unger*, 278 Mich App 210, 258; 749 NW2d 272 (2008). And there could also be other strategic considerations not easily identifiable in a cold appellate record. We have "been disinclined to find ineffective assistance of counsel" in this context because "[a] lawyer's hunches, based on his observations, may be as valid as any method of choosing a jury," and an appellate court does not have the benefit of observing the jurors or listening to their answers. *Id.* (cleaned up).

Moreover, it is difficult to establish the prejudice necessary to warrant relief as "jurors with real life experiences, who acknowledge that they can be free of bias and prejudice, can and do make excellent jurors." *Johnson*, 245 Mich App at 256 n 5. "[T]he juror's promise to keep matters

-4-

of [his or] her personal life separate from defendant's case [is] sufficient to protect defendant's right to a fair trial." *Id*. at 256. Accordingly, when a juror assures the trial court that he or she can be fair or impartial and the trial court accepts that juror's assurance—absent some other countervailing consideration—there is not a reasonable probability that the outcome of the case would have differed if the trial court did not impanel that juror. *Id*. at 259; *Unger*, 278 Mich App at 258.

After carefully reviewing the voir dire in full, we discern no error on either the court's or defense counsel's part. Defense counsel was actively engaged in questioning the potential jurors and in choosing a fair and impartial panel. The court sufficiently questioned the potential jurors to uncover any biases. Wright's arguments rely on cherry-picked statements taken entirely out of context. All three jurors affirmatively stated—some more than once—that they would apply the law as instructed. The jurors did not appear biased and defense counsel had no ground to challenge their impanelment. Accordingly, Wright is not entitled to relief.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Wright raises a litany of additional challenges to defense counsel's performance, none of which warrant relief.

### A. FAILURE TO PRESENT IMPEACHMENT EVIDENCE

At trial, Welford, who was in the same vehicle as Wright at the time of the shooting, testified that his ears did not hurt or ring after the shooting and he suffered no hearing loss. Wright contends that his attorney should have consulted with a medical professional to explore the likelihood of hearing damage from being in such close proximity to gunshots in an enclosed space. On appeal, Wright presents an "informational printout" from www.healthyhearing.com that suggests that hearing damage would have likely occurred in this setting. Such information could have been used to impeach Welford's eyewitness testimony, Wright urges. However, Welford's testimony was not the only evidence supporting that Wright was the shooter. And whether Welford suffered hearing damage was entirely collateral to the issue of whether Wright fired the fatal shots. "[I]t has long been the law of this state that a cross-examining attorney must accept the answer given by a witness regarding a collateral matter." *People v LeBlanc*, 465 Mich 575, 589; 640 NW2d 246 (2002). There was no legal basis to impeach Welford on this ground.

### B. FAILURE TO INVESTIGATE BACKGROUND OF INTENDED EXPERT

Wright argues that it was "irresponsible of counsel to self-exclude his expert" who was prepared to testify concerning the trajectory of the bullets if the vehicles were positioned "Even Steven" or directly parallel to one another. At some point during the course of the trial, the prosecutor informed defense counsel that his intended expert witness had stolen a firearm in another state. As a result of this information, defense counsel elected not to call the expert. It is not clear from the record exactly how the expert would have testified or if his testimony would have been admissible. Notably, the prosecution's expert testified that it was impossible to determine a reliable bullet trajectory because there were too many variables at play given the moving cars and multiple gunshots. Wright asserts that counsel should have known about this possible ground for impeachment at an earlier juncture in the case. However, Wright does not cite

nor are we aware of any requirement that defense counsel conduct background checks of its proposed expert witnesses. There simply is no indication that defense counsel inadequately investigated the matter. And counsel made an eminently reasonable tactical decision in light of events unfolding during the trial.

## C. FAILURE TO OBJECT DURING CLOSING ARGUMENT

Next, Wright contends that the prosecutor made several improper remarks during closing argument that should have spurred objections. Wright complains that to bolster the credibility of the state's witnesses, the prosecutor argued that Wright "eliminat[ed]" a witness against him and intimidated others, lied, and destroyed evidence. Wright further cites the prosecutor's allegedly unsupported claims that he was "arrested fleeing" from a house and abandoned his old cell phone, among other statements. These improper arguments "infected the entire closing argument," Wright asserts.

Prosecutors are "free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case," *People v Bailey*, 310 Mich App 703, 722; 873 NW2d 855 (2015) (cleaned up), but may not argue facts not in evidence or mischaracterize the evidence. *Unger*, 278 Mich App at 241. "[P]rosecutors may use 'hard language' when it is supported by evidence and are not required to phrase arguments in the blandest of all possible terms." *People v Ullah*, 216 Mich App 669, 678; 550 NW2d 568 (1996). A prosecutor also may argue from the facts that the defendant was not truthful. *People v Launsburry*, 217 Mich App 358, 361; 551 NW2d 460 (1996).

We have reviewed the entirety of the prosecutor's closing argument and find no evidence of prosecutorial misconduct. Moreover, it was reasonable for defense counsel to refrain from objecting to individual statements as this would have drawn attention to those comments. In any event, the trial court explicitly instructed the jury that the lawyers' remarks were not evidence and were only meant to help the jury understand each side's legal theories. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). Overall, none of the comments cited by Wright were so inflammatory as to prejudice Wright or deprive him of a fair and impartial trial.

## D. FAILURE TO OBJECT TO INADMISSIBLE EVIDENCE

Wright contends that counsel should have objected to inadmissible evidence presented by the prosecutor. Specifically, Wright maintains that counsel should have objected to Welford's testimony that he was told by a third-party that (1) Wright "was stopped when we were going in" to the Latvian Hall, (2) "they found a gun on him," (3) he "didn't actually see it, but they say he was jumped," and (4) "[t]hey said they were shooting at [defendant] and then everybody just ended up leaving" because these statements constituted inadmissible hearsay.

Evidence is generally admissible if it is relevant. MRE 402. Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. However, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or

-6-

by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403.

Although the contested testimony contained out-of-court statements, these statements were offered for the effect they had on the listener, and not for the truth of the matters asserted. Therefore, they were not inadmissible hearsay. *People v Gaines*, 306 Mich App 289, 307; 856 NW2d 222 (2014). Moreover, other than vaguely claiming "an immeasurable amount of damage to the defense," Wright does not explain how the failure to object resulted in prejudice. Absent any further analysis, we hold this argument abandoned. See *People v Henry*, 315 Mich App 130, 148; 889 NW2d 1 (2016).

Wright also argues that counsel should have objected to Welford's testimony that his girlfriend moved out of town and that he planned to move in the near future. Wright argues that this testimony was irrelevant "and was offered by the prosecution to inflame the jury and to confuse them." In context, the prosecutor was asking Welford what he did after learning that Swift had been killed and after testifying against Wright in response to the prosecution's investigative subpoena. The prosecutor broadly asked about Wright's purported attempts at intimidation, including approaching Welford at his jail work-release program and placing pictures of Welford taken at Wright's preliminary examination on social media. Evidence of Wright's attempts to influence witnesses was relevant because it tended to show consciousness of guilt. *People v Schaw*, 288 Mich App 231, 237; 791 NW2d 743 (2010). And the jury may properly consider "any fact that may have influenced the witness'[s] testimony." *People v Minor*, 213 Mich App 682, 685; 541 NW2d 576 (1995). Counsel had no reason to object to this highly relevant evidence and cannot be deemed ineffective in this regard. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

Wright admits that someone shot Swift "in the head, in his apartment and that he had been there for a couple days before he was discovered." Because this was undisputed, Wright contends that testimony from the medical examiner concerning Swift's autopsy "was highly irrelevant, inflammatory and confusing and the probative value of this evidence [was] far outweighed by the unfair prejudice that it inferred upon the defendant." However, evidence of Swift's autopsy was relevant because it established that Swift's cause of death was homicide and provided additional information concerning the time of Swift's death, which tended to corroborate other evidence establishing that Wright was the last person to see Swift alive. Contrary to Wright's argument, the prosecutor did not focus at length on the results of the Swift autopsy and defense counsel had no ground to object.

Wright also argues that defense counsel should have objected when the prosecutor asked Willie Calvin whether anyone had admitted to him "that they were in the shooting vehicle or a witness to a shooting" and whether anyone admitted to driving the vehicle. Had defense counsel objected, the court would have ruled that these hearsay statements were admissible as prior consistent statements helpful for rehabilitating the eyewitness who admitted to driving the shooter's vehicle and identified Wright as the shooter after defense counsel attacked his credibility. See *Jackson*, 292 Mich App at 598-599; MRE 801(d)(1). And the futile objection would have drawn further attention to this damaging testimony.

Wright contends that counsel should have objected when Carlasia Wells testified that she overheard a conversation between Swift and Wright, during which Swift said, "why do you keep calling me" and "leave me alone." Wells further heard Swift state that Welford "was a rat." These statements were admissible under the hearsay exception for statements made by a declarant made unavailable by an opponent. MRE 804(b)(6). To proceed under this hearsay exception, the prosecution must prove by a preponderance of the evidence that the defendant engaged in or encouraged wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness. *People v Jones*, 270 Mich App 208, 217; 714 NW2d 362 (2006). Swift was not available to testify because he had been murdered. And the evidence more than sufficed to establish that Wright was the one who killed him and that he did so to prevent him from testifying. Indeed, Wright was the last person to see or have any contact with Swift and he destroyed evidence of his communications with Swift. See *Unger*, 278 Mich App at 226-227 (permitting inferences of consciousness of guilt to be drawn from a defendant's destruction of evidence and deceptiveness).

## E. DEFENDANT'S MOTHER

Wright further contends that counsel should have objected when the prosecution failed to produce his mother as a witness at trial despite that it had endorsed her. He further argues that defense counsel should have requested an instruction that this missing witness's testimony would have been favorable to the defense. However, Wright admits that "[c]ounsel was well aware of [his mother's] presence in the lobby of the courthouse throughout the duration of trial, anticipating being called by the prosecution" and that the parties were aware of the nature of her proposed testimony because she testified at Wright's preliminary examination. If Wright's mother was known to be sitting in the lobby for the duration of the trial, the witness was not "missing," and defense counsel had no ground to request a missing-witness instruction.

Wright also contends that defense counsel should have called his mother as a defense witness at trial. Wright contends that his mother would have supported that he had not hidden a gun in the bag that he placed in the woods behind his girlfriend's house. At the preliminary examination, Wright's mother testified that she looked inside the bag and found cocaine and she presumably would have testified the same if called at trial. "[T]he failure to call a particular witness at trial is presumed to be a matter of trial strategy." *People v Seals*, 285 Mich App 1, 21; 776 NW2d 314 (2009). Counsel likely believed the jury would find the mother's testimony incredible. We have no reason to overturn that judgment.

## F. DEFENSE COUNSEL'S "PROMISE" TO PRODUCE WITNESS

Finally, Wright argues that defense counsel was ineffective because he "promised" during jury selection that he would call Derrick Banks as a witness. However, defense counsel made no such "promise." At the beginning of the jury selection process, the trial court asked the attorneys what witnesses they "may call during the trial of this matter," and defense counsel answered, "Derek Banks." The court then asked the potential jurors if they knew any of the identified witnesses. In context, neither party was promising to present the named witnesses; they were simply listing potential witnesses for the purpose of selecting unbiased jurors. See *People v Sawyer*, 215 Mich App 183, 186; 545 NW2d 6 (1996) ("The function of voir dire is to elicit sufficient information from prospective jurors to enable the trial court and counsel to determine

who should be disqualified from service on the basis of an inability to render decisions impartially."). It is a mischaracterization to label defense counsel's response a "promise," the breaking of which might give rise to some basis for appellate relief.

## V. NEWLY DISCOVERED EVIDENCE

Wright contends that he has "newly discovered evidence" that Swift fired the shot that killed Davis. On appeal, he presented a handwritten, sworn affidavit from Johnqual Shaw, in which Shaw asserts that Swift admitted to shooting Davis. Wright argues that this new evidence entitles him to a new trial.

"Historically, Michigan courts have been reluctant to grant new trials on the basis of newly discovered evidence." *People v Blevins*, 314 Mich App 339, 359; 886 NW2d 456 (2016) (cleaned up). To merit a new trial,

> a defendant must show that: (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial. [*People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003) (cleaned up).]

The affidavit presented by defendant does not constitute "newly discovered evidence." Wright merely asserts that he was personally unaware of Swift's statement to Shaw until May 2020. This is insufficient. Wright made no attempt to explain why he could not have discovered this information sooner with reasonable diligence. Accordingly, Wright cannot establish that he is entitled to a new trial.

## VI. JURY WITNESS QUESTIONS

Finally, Wright contends that the trial court abused its discretion when it declined to ask Welford two questions submitted by a juror. We review for an abuse of discretion a trial court's decision to allow jury questioning of witnesses. *People v Heard*, 388 Mich 182, 187; 200 NW2d 73 (1972). "An abuse of discretion occurs when the trial court chooses an outcome that falls outside the range of principled outcomes." *People v March*, 499 Mich 389, 397; 886 NW2d 396 (2016) (cleaned up).

In *Heard*, 388 Mich at 187-188, our Supreme Court recognized that "in certain circumstances, a juror might have a question which could help unravel otherwise confusing testimony" and that, "[i]n such a situation, it would aid the fact-finding process if a juror were permitted to ask such a question." Ultimately, our Supreme Court explained, "the questioning of witnesses by jurors, and the method of submission of such questions, rests in the sound discretion of the trial court." *Id*. at 188. MCR 2.513(I) codifies this practice into our court rules, expressly permitting jurors to ask questions at trial:

> The court may permit the jurors to ask questions of witnesses. If the court permits jurors to ask questions, it must employ a procedure that ensures that such questions are addressed to the witnesses by the court itself, that inappropriate questions are not asked, and that the parties have an opportunity outside the hearing

of the jury to object to the questions.  The court shall inform the jurors of the procedures to be followed for submitting questions to witnesses.

As part of its initial instructions, the trial court informed the jurors that it would give them an opportunity to ask questions of witnesses, explaining, "I'll look at it, and if I can ask it, I will. If I can't, I won't."  Repeatedly throughout the course of the prosecution's case, the trial court allowed the jurors to ask questions via this procedure.  On appeal, Wright argues that the trial court erred by not asking the following two questions: "Who was in the front seat with you before you picked up [Wright]?" and "Just before the shooting, did the car [the victim] was in pull up next to you or did you pull up next to it?"  It is not apparent from the existing record why the trial court rejected these questions.  MCR 2.513(I) requires "that the parties have an opportunity outside the hearing of the jury to object to the questions."  This opportunity was not provided.  However, this error was harmless.  The record testimony was sufficient to answer these questions.

We affirm.

/s/ Christopher M. Murray
/s/ Karen M. Fort Hood
/s/ Elizabeth L. Gleicher

-10-